Citation Nr: 1334650 
Decision Date: 10/30/13 Archive Date: 11/06/13

DOCKET NO. 07-23 063 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs (VA) Regional Office in Muskogee, Oklahoma


THE ISSUE

Entitlement to an initial evaluation in excess of 30 percent for residuals of traumatic brain injury (TBI) to include vertigo, oscillopsias, abnormal gait, and status post repair of perilymph fistulas.


REPRESENTATION

Veteran represented by: Stephanie Grogan, Agent


WITNESSES AT HEARING ON APPEAL

Veteran, his spouse, and his father 


ATTORNEY FOR THE BOARD

D. M. Donahue, Associate Counsel
INTRODUCTION

The Veteran served on active duty from July 2002 to February 2005. 

This matter originally came before the Board of Veterans' Appeals (hereinafter Board) on appeal from rating decisions by the Department of Veterans Affairs (VA) Regional Office (RO) in Muskogee, Oklahoma. By a rating action in January 2006, the RO granted service connection for residuals of a concussion, vertigo with repair of perilymph fistulas, and assigned a 10 percent disability rating, effective February 22, 2005. The Veteran perfected an appeal to that decision. Subsequently, in January 2008, a Decision Review Officer (DRO) decision granted service connection for PTSD and assigned a 50 percent disability rating, effective February 22, 2005. The DRO decision also increased the evaluation for residual of a concussion, vertigo with abnormal gait and oscillopsias, with repair of perilymph fistulas, from 10 percent to 30 percent disabling, effective February 22, 2005. 

In August 2011, the Board, in pertinent part, denied an increased rating for TBI to include vertigo, oscillopsias, abnormal gait, and status post repair of fistulas. The Veteran appealed the Board's decision to the Court. In August 2011, the Court granted a joint motion for remand (JMR) filed by representatives for both parties, vacating the Board's decision to the extent that it denied an increased rating for TBI and remanding the claim to the Board for further proceedings consistent with the JMR.

In March 2010, the Board remanded the case to the RO in order to afford the Veteran an opportunity to testify at a hearing before the Board. On March 30, 2011, the Veteran appeared at the Muskogee RO and testified at a videoconference hearing before the undersigned Acting Veterans Law Judge, sitting in Washington, DC. A transcript of this hearing is of record. At the hearing, the Veteran submitted additional evidence for which he provided written waiver of RO review under 38 C.F.R. § 20.1304 (2013). Thus, there is compliance with the Board's remand instruction. See Stegall v. West, 11 Vet. App. 268, 271 (1998) (noting that where the remand orders of the Board are not complied with, the Board errs as a matter of law when it fails to ensure compliance).


FINDINGS OF FACT

1. The Veteran is in receipt of the maximum disability evaluation assignable under Diagnostic Code 6204 for peripheral vestibular disorders. 

2. Service connection is in effect for tinnitus; the Veteran's vertigo is manifested by dizziness and occasional staggering, but without current hearing impairment or clinical evidence of a cerebellar gait. 

3. Cognitive and emotional impairment are rated in conjunction with posttraumatic stress disorder. 


CONCLUSION OF LAW

The criteria for an initial evaluation in excess of 30 percent disabling for residuals of TBI to include vertigo, oscillopsias, abnormal gait, and status post repair of perilymph fistulas have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103A, 5107 (West 2002 & Supp. 2013); 38 C.F.R. §§ 4.1, 4.7, 4.10, 4.21, 4.87, Diagnostic Code 6204 (2013). 


REASONS AND BASES FOR FINDINGS AND CONCLUSION

I. Duty to Notify and Assist.

The Veterans Claims Assistance Act of 2000 (VCAA) enhanced VA's duty to notify and assist claimants in substantiating their claims for VA benefits, as codified in pertinent part at 38 U.S.C.A. §§ 5103, 5103A (West 2002 & Supp. 2011); 38 C.F.R. §§ 3.159, 3.326(a) (2013). 

Upon receipt of a complete or substantially complete application for benefits, VA is required to notify the claimant of the information and evidence not of record that is necessary to substantiate the claim; and to indicate which information and evidence VA will obtain and which information and evidence the claimant is expected to provide. 38 U.S.C.A. § 5103(a) (West 2002); 38 C.F.R. § 3.159(b) (2013). The United States Court of Appeals for Veterans Claims (Court) has held that VCAA notice should be provided to a claimant before the initial RO decision on a claim. Pelegrini v. Principi, 18 Vet. App. 112 (2004). However, if VCAA notice is provided after the initial decision, such a timing error can be cured by subsequent readjudication of the claim, as in a statement of the case (SOC) or supplemental SOC (SSOC). Mayfield v. Nicholson, 20 Vet. App. 537, 543 (2006); Prickett v. Nicholson, 20 Vet. App. 370, 376 (2006). 

In this case, VA satisfied its duty to notify by means of a letter dated in October 2005 from the RO to the Veteran which was issued prior to the RO decisions in January 2006 and January 2008. An additional letter was issued in August 2008. Those letters informed the Veteran of what evidence was required to substantiate the claims and of his and VA's respective duties for obtaining evidence. Accordingly, the requirements the Court set out in Pelegrini have been satisfied. 

The Board finds that the content of the above-noted letters provided to the Veteran complied with the requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) regarding VA's duty to notify. 

Regarding the duty to assist, the Board notes that the Veteran was provided an opportunity to submit additional evidence. It also appears that all obtainable evidence identified by the Veteran relative to the claims decided herein has been obtained and associated with the claims file, and that neither he nor his representative has identified any other pertinent evidence not already of record that would need to be obtained for a proper disposition of these claims. It is therefore the Board's conclusion that the Veteran has been provided with every opportunity to submit evidence and argument in support of his claims, and to respond to VA notices. 

The Veteran has been afforded VA examinations on the issues decided herein. McLendon v. Nicholson, 20 Vet. App. 79 (2006). The examinations were conducted by medical professionals who reviewed the medical records, solicited history from the Veteran, and provided information necessary to decide the issue addressed in this decision. Nieves-Rodriguez v. Peake, 22 Vet. App 295 (2008). 

Accordingly, the Board finds that VA has satisfied its duty to notify and assist the Veteran in apprising him as to the evidence needed, and in obtaining evidence under the VCAA. Therefore, no useful purpose would be served in remanding these matters for yet more development. Such a remand would result in unnecessarily imposing additional burdens on VA, with no additional benefit flowing to the Veteran. The Court has held that such remands are to be avoided. Sabonis v. Brown, 6 Vet. App. 426, 430 (1994). 

II. Factual background.

The service treatment records indicate that the Veteran was seen at a clinic in November 2003 with complaints of hearing loss in both ears after an improvised explosive device (IED) explosion one month before. At that time, he stated that, for one week after the explosion, he heard ringing in both ears. He also complained of dizziness while walking and climbing. The assessment was noise trauma. In January 2004, the Veteran was brought into a clinic by another soldier. Following an evaluation, he was diagnosed with vertigo, secondary to acoustic trauma. An emergency treatment note, dated in February 2004, indicates that the Veteran was involved in an IED explosion in October 2003, which affected the left side of his body. It was noted that he initially had decreased hearing in both ears and confusion, but no loss of consciousness; two week later, he experienced dizzy spells and vomiting. Following an evaluation, he was diagnosed with vertigo, secondary to perilymph fistula. In March 2004, the Veteran was seen for evaluation of balance problems. The assessment was balance disorder of unknown etiology. 

Of record is a medical evaluation board proceeding dated in September 2004, which reflected an assessment of paroxysmal vertigo likely secondary to perilymph fistulas sustained after a blast injury in October 2003. Therefore, separation from service was recommend based on the severity of the Veteran's profile and his inability to perform even the most routine military duties due to the paroxysmal and often unpredictable nature of his vertigo. A physical evaluation board proceedings report, dated January 19, 2005, determined that the Veteran was disabled due to paroxysmal vertigo with onset of October 29, 2005, while deployed to Iraq. It was noted that the Veteran had concussive effects of an IED, which exploded 15 meters away. Initially, he had loss of hearing and tinnitus in addition to vertigo; his hearing returned, but episodes of paroxysmal vertigo induced by head motion on bending persisted. Bilateral endolymph fistula was diagnosed and repaired with only marginal improvement. Exertional vertigo prevented functioning in primary military occupational specialty and profile restricted Army physical fitness test and soldiering in the field. 

The Veteran's claim for service connection (VA Form 21-526) was received in March 2005. Submitted in support of the Veteran's claim were treatment records from Eastern Oklahoma Ears, Nose and Throat dated from May 1999 to July 2005. The records indicate that the Veteran was seen in December 2003 for a follow up evaluation; it was noted that he had been having balance problems. It was noted that his symptoms began approximately one month before as a result of an IED used in the military that went off about 15 meters from him on October 29, 2003 in Iraq; since then, he has had tinnitus and some vertigo. The assessment was vertigo, etiology unknown and injury to acoustic nerve. 

In a statement dated in December 2003, Dr. William P. Sawyer stated that the Veteran had been diagnosed with a peripheral left vestibular lesion, secondary to an explosive incident while in the service. Dr. Sawyer observed that the Veteran's symptoms and his ENG suggested that he had a possible perilymph fistula which required evaluation by a neuro-otologist and possible surgery for correction of this. In March 2004, he was diagnosed with questionable vestibular trauma. In June 2004, the Veteran was admitted to a hospital with a diagnosis of possible perilymph fistula in both ears with a history of previous explosive injury. He underwent bilateral middle ear exploration with repair of oval and round window fistula, bilaterally. 

The Veteran was afforded a VA examination in October 2007. At that time, he reported having anger outbursts several times a week and especially has had episodes of becoming extremely angered when waking up either unexpectedly or from dreams. It was noted that he has had episodes where he ripped a door off of his apartment, went outside, punched the wall, and picked up an ottoman and slammed it against his nose, breaking his nose during anger outbursts. The Veteran reported difficulty falling asleep and related having nightmares. The Veteran also acknowledged having flashbacks, especially when smelling garbage or a smell similar to burning flesh. He also had startled response and anxiety attacks that bordered on panic attacks several times a week, and he took efforts to avoid reminders of the intrusive events. The Veteran also reported feeling detached from others. 

On mental status examination, the Veteran was oriented in all spheres. He was alert, rather intense; he was cooperative with examination procedures. No hallucinations or delusions were noted. The Veteran denied having homicidal or suicidal ideations. The examiner noted that the Veteran's anger outbursts and concentration have had some impact on his employment functioning. The Veteran reported only having one friend and the detachment from others was noted in terms of the relationship with his wife. It was noted that the Veteran was basically socially isolated at the present time and reported not engaging in leisure activities other than visiting one friend once every two weeks. The Veteran showed no impairment in thought process or communication during the examination. The Veteran was independent in activities of daily living. The examiner stated that the Veteran met the criteria of PTSD, chronic, secondary to events that occurred while he was in the U.S. Army. The pertinent diagnosis was PTSD; and the Veteran was assigned a GAF score of 55. 

The Veteran was also afforded an examination for evaluation of TBI in October 2007. The Veteran reported a history of injury while in the military in October 2003; he stated that an IED went off about 12 to 15 meters away from the vehicle he was on and he fell backwards onto the vehicle. The Veteran denied any acute loss of consciousness at that time; he reported having some facial lacerations, decreased hearing and tinnitus. The Veteran related that he started having some problems with his balance after he returned to the base; he stated that the balance problem became more and more problematic. The examiner noted that the condition stabilized after he came back to the United States and then about a year ago, he suddenly started having problems with memory, concentration, and his ability to differentiate time. Since then he has not regained any stability as far as his memory or ability to concentrate. The Veteran denied having headaches. He reported having an episode of vertigo at least once a week that is so debilitating that he has to go to bed about for 24 hours for it to pass. He denied any weakness or paralysis. He was positive for sleep disturbance. He stated that he slept very little; when he went to go to sleep he became violent. It was reported that bright lights precipitated his imbalance so he was unable to mobilize; his balance increased with walking in bright lights. He did not require any kind of device for ambulation. He had moderate-to-severe memory impairment. The examiner noted that the Veteran had slowness of thought and confusion, and decreased attention and concentration. 

On examination, there were no areas of weakness or paralysis. Muscle tone was good. There was no muscle atrophy or loss of muscle tone. Deep tendon reflexes were present with symmetrical positive reflexes. Sensory function of the lower extremities was intact; he was able to differentiate dull-to-sharp sensation. He was able to feel monofilament. His gait was wide stance. There appeared to be some instability with the use of his arm for attaining that balance. There was no problem with orthostatic, hypotension, or hyperhydrosis. Cranial nerves II-XII appeared intact. His cognitive impairment mini-mental state was stable to draw or clock. There was a definite problem with memory. He was awake, alert, very cooperative, and very appropriate in speech and dress. A CT scan of the head was reported as normal. The pertinent diagnosis was traumatic brain injury with severe cognitive impairment manifested by decreased attention, decreased concentration, and increased aggressiveness. He also had a right tibia-fibula fracture at his distal lower extremity which was stable. 

On November 8, 2007, the Veteran was seen at a VA clinic in order to establish care; it was noted that he had trouble with staying focused in school and being interested in a subject matter, and he had symptoms of PTSD. It was also noted that the Veteran had dizziness post an explosion on active duty, and he had surgery on both ears, with residual incoordination. The impression was PTSD symptoms, and post-explosive concussive injuries leading to ear and eye problems. On November 19, 2007, the Veteran was referred for mental health consultation by his primary care physician due to positive PTSD and depression screenings. It was noted that the Veteran was involved in many combat operations, witnessed many traumatic events, had two friends killed, and suffered physical and emotional symptoms secondary to an explosion. The Veteran reported symptoms of nightmares, sleep problems, hypervigilance, detachment from others, difficulty with attention/concentration/memory, avoidance of situations/triggers, problems in school and in relationships, fatigue, and anhedonia. The examiner stated that the Veteran met the diagnostic criteria for a diagnosis of PTSD. A subsequent mental health note, dated November 29, 2007, reflects an assessment of PTSD; and he was assigned a GAF score of 65. 

Of record is the result of a comprehensive evaluation of the Veteran conducted by Dr. Joseph Schwartz in October 2008. Dr. Schwartz stated that, during his face to face interview with the Veteran, he expressed guilt over his poor memory, inability to focus, and difficulty in expressing his opinions and thoughts; he claimed that this impaired ability to communicate clearly became increasingly worse since his brain injury and discharge from military service. Dr. Schwartz noted that the effects of the IED related injuries have resulted in a marked worsening of biologically based communication deficits and also caused the Veteran to suffer a sense of guilt and shame, sense of impotency, powerlessness, and frustration in social/family interactions and communication. The examiner stated that the Veteran's condition had been compounded by the synergistic effects to two clinical and biologically based conditions which have resulted from his wartime experiences. Dr. Schwartz indicated that the medical literature suggested that TBI initially dampens the acute clinical manifestations of PTSD; in other words, the TBI blunts the initial overt PTSD symptoms, but the overt symptoms will become more manifest as the brain slowly recovers some of its functioning. Dr. Schwartz concluded that, based on the extensive psychological assessment, review of research literature regarding the Veteran's injuries, and the collective clinical experience of the staff, the Veteran demonstrated significant and deleterious signs of traumatic brain injury interactive with PTSD. 

The Veteran was afforded another VA examination in March 2009. It was noted that the Veteran broke his hand last year punching a soccer goal post when he was angry. The Veteran reported having night terrors that he did not remember, and they often involved trying to drive or breaking things. He had these episodes every 5 to 6 months. It was noted that the Veteran had been married seven years to his current wife, with whom he had two children; they get along all right with ups and downs. The Veteran reported that he had a friend and a couple of co-workers who came around occasionally; he also saw his sister and parents occasionally. On mental status examination, the Veteran was described as clean, neatly groomed and appropriately dressed. His speech was unremarkable; he was cooperative, friendly, and attentive; his affect was appropriate; his mood was anxious; he was fully oriented; his thought process and content were unremarkable; and no inappropriate or obsessive/ritualistic behavior was noted. The Veteran reported persistent visual hallucinations. The Veteran reported homicidal ideation but no action. He denied any suicidal thoughts, but he stated that he has hurt himself impulsively when angry. Remote memory was severely impaired, recent memory was mildly impaired, but immediate memory was normal. The examiner stated that the Veteran's PTSD symptoms included recurrent and intrusive distressing recollections of the event, including images, thoughts, or perceptions; acting or feeling as if the traumatic event when recurring; and intense psychological distress at exposure to internal or external cues that symbolize or resemble an aspect of the traumatic event. The diagnosis was PTSD; he was assigned a GAF score of 55. 

On the occasion of another VA examination for TBI in October 2009, the Veteran indicated that he continued to have dizziness and had surgery on both inner ears in 2004 at St. Francis Hospital. He stated that he still felt dizzy intermittently and had trouble driving a car at night as he saw things which were not there on the road. The Veteran also reported memory problems. The Veteran reported dizziness three to four times a week; he also reported problems with balance while walking and stated that he sometimes ran into walls in his office. The Veteran also reported difficulty sleeping; he stated that he sometimes woke up during the night, got angry and became violent. The Veteran indicated that he had difficulty concentrating and feeling drowsy during the day. The Veteran was described as being alert, oriented, and in no acute distress. He was ambulatory and walked in without any walking aids; his posture and gait were normal. He was well nourished, well developed, and mildly obese. There was no evidence of anemia, cyanosis, clubbing of fingers, or edema of the feet; and no tremors were noted. Sensory and motor examination of the upper and lower extremities was unremarkable. CT scan of the brain was normal. The pertinent diagnosis was history of TBI with residual vertigo and oscillopsias with normal examination. It was noted that a problem associated with the diagnosis was vertigo with abnormal gait and oscillopsias. 

Received in March 2010 was the report of a neuropsychological examination conducted by Dr. Lance E. Trexler in February 2010. Dr. Trexler stated that the neuropsychological data clearly indicate impairment across multiple domains of functioning, but in summary the data was consistent with probable bitemporal lobe injuries affecting the left temporal lobe more than the right. The Veteran had a mild degradation of visual memory unless he had the opportunity to practice, but he had at least a moderate impairment of verbal memory, again unless he had the opportunity to practice the information repetitively. Consistent with this hypothesis, he also had a mild deficit in naming and a mild deficit in functions of the right upper extremity for motor speed and strength relative to the dominant left upper extremity. It was also noted that the Veteran showed some disturbance in attention and working memory that are hallmark findings in traumatic brain injury. He presented with considerable neurobehavioral disturbance including episodes of rage that occurred several times a week, often for which he was amnesic, obviously resulting in considerable stress at home. The vocational implications had been very difficult for the Veteran and he had been unable to keep a job as a consequence. 

Another VA examination for evaluation of PTSD was conducted in April 2010. The Veteran described symptoms of isolation, depression, sleep disorder, nightmares, hypervigilance, and recurrent recollections. He stated that the symptoms were constant and severe. The Veteran related that his irritability affected his marriage and family. He had been fired from two jobs since his discharge from military service. The Veteran reported difficulty falling and staying asleep due to occasional nightmares. He denied any history of violent behavior or suicide attempts. It was noted that the Veteran had received psychotherapy for his mental condition over the past year and the response had been fair. The Veteran reported problems with irritability which has caused his wife and children to leave for a few weeks. He tended to withdraw at home and did not like to go out socially. 

On mental status examination, orientation was within normal limits. Appearance and hygiene were appropriate; and behavior was appropriate. He maintained good eye contact during the examination. Affect and mood showed a disturbance of motivation and mood. He described being hypervigilant and isolated. Communication and speech were within normal limits. The Veteran demonstrated impaired attention and/or focus. He had difficulty finishing things both at home and school. Panic attacks were absent. There were signs of suspiciousness, which included difficulty entering public places. No delusions or hallucinations were noted. Thought processes were appropriate. He did not have slowness of thought nor did he appear confused. Judgment was not impaired. Abstract thinking was normal. Memory was mildly impaired. He was not currently suicidal or homicidal. There were behavioral, cognitive, social, affective, or somatic symptoms attributed to PTSD and were described as hypervigilance, sleep disorder with occasional nightmares, isolation, irritability, and recurrent recollections. The pertinent diagnoses were PTSD and depressive disorder not otherwise specified; the GAF score was 64. The examiner noted that the Veteran had difficulty establishing and maintaining effective work/school and social relationships because he has only one friend; he preferred not to go out socially. He also had difficulty maintaining effective family role functioning because there had been marital issues. The examiner indicated that the Veteran did not appear to pose any threat of danger or injury to self or others; the prognosis for the psychiatric condition was fair. 

In June 2010, the Veteran was afforded a VA examination for evaluation of the TBI. The Veteran indicated that his main problems were memory loss, sleep problem, mood swings and vertigo. He stated that he sometimes still had vertigo problem and occasionally felt dizzy. The Veteran noted that he became off balance when he had dizzy spells. The Veteran indicated that sometimes he was unable to sleep and he got very irritable. He also reported difficulty concentrating. On examination, the Veteran was described as alert, oriented and not in any distress. He was ambulatory and walked in without any walking aids; his posture and gait were normal. He was well nourished and well developed; there was no evidence of anemia, cyanosis, clubbing of fingers, or edema of the feet. No tremors or fasciculations were noticed. Sensory and motor examinations were normal in both upper and lower extremities. The Veteran reported mild memory loss and problems with attention, concentration, and executive functions, but there was no evidence of such on testing. He was fully oriented. A CT scan of the brain, dated June 21, 2010, was normal. The pertinent diagnosis was history of TBI with residual vertigo and oscillopsias and status post repair of perilymph fistulas with normal examination; there was no evidence of abnormal gait or any balancing problem. 

On the occasion of yet another VA examination for evaluation of PTSD in June 2010, the Veteran indicated that he had good relationships with his wife and two children, but mood swings between anger and happiness made it difficult. He noted that his wife and kids left him for about a week last year. It was noted that the Veteran still had one friend whom he saw once or twice a week. The Veteran denied a history of suicidal attempts. He reported getting really angry at his wife and pushing her away physically last year. On examination, the Veteran was described as clean, neatly groomed, and appropriately dressed. Speech was unremarkable and psychomotor activity was normal. He was cooperative, friendly, and attentive; his affect was normal; and his mood was anxious, good, agitated, depressed, and fearful. His attention problems fluctuated. He was oriented to person, time, and place; and his thought process and content were unremarkable. Panic attacks were absent; and no delusions or hallucinations were noted. He had no suicidal or homicidal thoughts. Remote memory was moderately impaired, recent memory was mildly impaired, and immediate memory was mildly impaired. The pertinent diagnosis was PTSD; he was assigned a GAF score of 55. 

Of record is the report of a psychological evaluation conducted by Dr. Thomas A. Hoffmann dated March 9, 2011. It was noted that the Veteran was casually dressed. He walked and moved in an awkward manner and had mild expressive aphasia. He had a flat affect, was cooperative, and worked slowly. Dr. Hoffmann observed that the Veteran had obvious memory problems but appeared to answer all questions in an honest if somewhat naïve manner. It was noted that the Veteran had been married for nine years with two daughters; he and his wife both acknowledged serious marital difficulties secondary to his anger and impulse control issues. The Veteran's wife reported leaving him three times last year; she noted that the Veteran was very verbally abusive toward her and her daughters. She also reported that he had been physically abusive toward her. The Veteran was reportedly especially volatile in the morning and upon awakening; this was often secondary to poor sleep. He had been noted to walk in his sleep and had broken off doors in fits of rage. The Veteran's wife questioned her ability to remain married to him given the severity of his PTSD and TBI. The Veteran worked part time for his father's business; however, they both reported difficulties with his job performance. It was noted that the Veteran previously worked for a family friend, but he eventually lost that job due to poor job performance. He was reportedly very volatile at his last job and got into a physical altercation with a fellow employee that led to his being fired. 

Following evaluation and testing, Dr. Hoffmann stated that the Veteran had marked occupational and social impairment with deficiencies in most areas, including work, school, family relations, judgment, and mood. He had passive suicidal ideations, poor impulse control with significant irritability and episodes of violence, and he had difficulty adapting to stressful circumstances. Dr. Hoffmann further noted that the Veteran has had difficulty maintaining his marital relationship. He stated that the Veteran's symptoms appeared to have become more severe over the past year. Dr. Hoffmann related that the Veteran's prognosis was guarded given the severity of his symptoms and lack of response to treatment to date. The pertinent diagnoses were PTSD, chronic with depressed features; and cognitive disorder, not otherwise specified. He was assigned a GAF score of 47. 

At his personal hearing in March 2011, the Veteran's representative related that he was exposed to multiple IED explosions while on active duty in Iraq; and his resulting TBI led to physical, emotional, mental and cognitive impairments that have severely impact his daily life activities. The representative also reported that the Veteran suffered from PTSD which resulted in mood swings, anger outbursts, and occupational and social difficulties. The Veteran testified that his symptoms of TBI included dizziness, difficulty with balance, nausea, and problems with concentration. The Veteran indicated that he had nightmares that caused him to wake up screaming; he also noted problems with memory loss. The Veteran related that he experienced anger outbursts; he described an incident when he hit himself in the face with an ottoman and broke his nose. The Veteran stated that he kept to himself. The Veteran reported that his anger was getting worse to the point that it was affecting his marriage. The Veteran's wife testified that she was very careful so as not to get him angry; she was afraid of him and did not know what he was going to do at any time. She reported that the Veteran would grab whatever was nearby and throw it; she stated that he called her all kinds of names. The Veteran's father testified as to the changes in his mood and personality as a result of his injuries and PTSD; he stated that the anger was triggered by stress and conflict. He also noted that the Veteran experienced intrusive thoughts and flashbacks. He reported that the Veteran's work schedule is erratic. 

III. Legal Analysis-Higher Evaluations.

Disability evaluations are determined by evaluating the extent to which a Veteran's service-connected disability adversely affects his ability to function under the ordinary conditions of daily life, including employment, by comparing his symptomatology with the criteria set forth in the Schedule for Rating Disabilities (rating schedule). 38 U.S.C.A. § 1155 (West 2002 & Supp. 2013); 38 C.F.R. §§ 4.1, 4.2, 4.10 (2013). If two evaluations are potentially applicable, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that evaluation; otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2013). 

A disability may require re-evaluation in accordance with changes in a Veteran's condition. It is thus essential, in determining the level of current impairment, that the disability be considered in the context of the entire recorded history. 38 C.F.R. § 4.1 (2013). However, where an award of service connection for a disability has been granted and the assignment of an initial evaluation is at issue, separate evaluations can be assigned for separate periods of time based on the facts found. In other words, the evaluations may be "staged." Fenderson v. West, 12 Vet. App. 119, 126 (2001). 

When all the evidence is assembled, the Board is then responsible for determining whether the evidence supports the claim or is in relative equipoise, with the appellant prevailing in either event, or whether the preponderance of the evidence is against the claim, in which case the claim is denied. See 38 U.S.C.A. § 5107(a) (West 2002); 38 C.F.R. § 3.102 (2013); Gilbert v. Derwinski, 1Vet. App. 49, 55 (1990). 

Residuals of TBI, generally.

The applicable rating criteria of Diagnostic Code 8045 for evaluating traumatic brain injuries were amended during the pendency of the appeal. See 73 Fed. Reg. 54693 (Sept. 23, 2008). The amended criteria apply to all claims received by VA on and after October 23, 2008, although the Veteran was permitted to request that his residuals of a traumatic brain injury be rated under the revised criteria. 

For claims received by VA prior to that effective date, a veteran is to be rated under the old criteria for any periods prior to October 23, 2008, but under the new criteria or the old criteria, whichever are more favorable, for any period beginning on October 23, 2008. The claim is to be rated under the old criteria unless applying the new criteria results in a higher disability rating. See VBA Fast Letter 8-36 (October 24, 2008). In this case, the Veteran has only asserted a higher rating is warranted for the period from October 23, 2008. 

The revised Diagnostic Code 8045 states that there are three main areas of dysfunction that may result from TBIs and have profound effects on functioning: cognitive (which is common in varying degrees after a TBI), emotional/behavioral, and physical. Each of these areas of dysfunction may require evaluation. 38 C.F.R. § 4.124a, Diagnostic Code 8045. A lengthy discussion of the amended code is provided below. Cognitive impairment is defined as decreased memory, concentration, attention, and executive functions of the brain. Executive functions are goal setting, speed of information processing, planning, organizing, prioritizing, self-monitoring, problem solving, judgment, decision making, spontaneity, and flexibility in changing actions when they are not productive. Not all of these brain functions may be affected in a given individual with cognitive impairment, and some functions may be affected more severely than others. In a given individual, symptoms may fluctuate in severity from day to day. Cognitive impairment is evaluated under the table titled 'Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified'.

Subjective symptoms may be the only residual of TBI or may be associated with cognitive impairment or other areas of dysfunction. Subjective symptoms that are residuals of a TBI, whether or not they are part of cognitive impairment, are evaluated under the subjective symptoms facet in the table titled 'Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified.' However, any residual with a distinct diagnosis that may be evaluated under another diagnostic code, such as migraine headache or Meniere's disease, is separately evaluated, even if that diagnosis is based on subjective symptoms, rather than under the 'Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified' table.

Emotional/behavioral dysfunction is evaluated under § 4.130 (Schedule of ratings-mental disorders) when there is a diagnosis of a mental disorder. When there is no diagnosis of a mental disorder, emotional/behavioral symptoms are evaluated under the criteria in the table titled 'Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified'.

Physical (including neurological) dysfunction is evaluated based on the following list, under an appropriate diagnostic code: motor and sensory dysfunction, including pain, of the extremities and face; visual impairment; hearing loss and tinnitus; loss of sense of smell and taste; seizures; gait, coordination, and balance problems; speech and other communication difficulties, including aphasia and related disorders, and dysarthria; neurogenic bladder; neurogenic bowel; cranial nerve dysfunctions; autonomic nerve dysfunctions; and endocrine dysfunctions.

The preceding list of types of physical dysfunction does not encompass all possible residuals of a TBI. Residuals not listed here that are reported on an examination are to be evaluated under the most appropriate diagnostic code. Each condition is evaluated separately, as long as the same signs and symptoms are not used to support more than one evaluation, and the evaluations for each separately rated condition are then combined under § 4.25. The evaluation assigned based on the 'Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified' table will be considered the evaluation for a single condition for purposes of combining with other disability evaluations.

The need for special monthly compensation is to be considered for such problems as loss of use of an extremity, certain sensory impairments, erectile dysfunction, the need for aid and attendance (including for protection from hazards or dangers incident to the daily environment due to cognitive impairment), being housebound, etc.

For the evaluation of cognitive impairment and subjective symptoms, the table titled 'Evaluation of Cognitive Impairment and Other Residuals of TBI Not Otherwise Classified' contains 10 important facets of TBI related to cognitive impairment and subjective symptoms. It provides criteria for levels of impairment for each facet, as appropriate, ranging from 0 to 3, and a 5th level, the highest level of impairment, and labeled 'total'. However, not every facet has every level of severity. The Consciousness facet, for example, does not provide for an impairment level other than 'total', since any level of impaired consciousness would be totally disabling. A 100 percent evaluation is assigned if 'total' is the level of evaluation for one or more facets. If no facet is evaluated as 'total', the overall percentage evaluation is assigned based on the level of the highest facet as follows: 0 = 0 percent; 1 = 10 percent; 2 = 40 percent; and 3 = 70 percent. For example, a 70 percent evaluation is assigned if 3 is the highest level of evaluation for any facet.

Note (1): There may be an overlap of manifestations of conditions evaluated under the table titled 'Evaluation Of Cognitive Impairment And Other Residuals Of TBI Not Otherwise Classified' with manifestations of a comorbid mental or neurologic or other physical disorder that can be separately evaluated under another diagnostic code. In such cases, more than one evaluation is not assigned based on the same manifestations. If the manifestations of two or more conditions cannot be clearly separated, a single evaluation is assigned under whichever set of diagnostic criteria allows the better assessment of overall impaired functioning due to both conditions. However, if the manifestations are clearly separable, a separate evaluation is assigned for each condition.

Note (2): Symptoms listed as examples at certain evaluation levels in the table are only examples and are not symptoms that must be present in order to assign a particular evaluation.

Note (3): 'Instrumental activities of daily living' refers to activities other than self-care that are needed for independent living, such as meal preparation, doing housework and other chores, shopping, traveling, doing laundry, being responsible for one's own medications, and using a telephone. These activities are distinguished from 'Activities of daily living,' which refers to basic self-care and includes bathing or showering, dressing, eating, getting in or out of bed or a chair, and using the toilet.

Note (4): The terms 'mild,' 'moderate,' and 'severe' TBI, which may appear in medical records, refer to a classification of TBI made at, or close to, the time of injury rather than to the current level of functioning. This classification does not affect the rating assigned under Diagnostic Code 8045.

Note (5): A veteran whose residuals of TBI are rated under a version of § 4.124a, Diagnostic Code 8045, in effect before October 23, 2008 may request review under Diagnostic Code 8045, irrespective of whether his or her disability has worsened since the last review. VA will review that veteran's disability rating to determine whether the veteran may be entitled to a higher disability rating under Diagnostic Code 8045. A request for review pursuant to this note will be treated as a claim for an increased rating for purposes of determining the effective date of an increased rating awarded as a result of such review; however, in no case will the award be effective before October 23, 2008. For the purposes of determining the effective date of an increased rating awarded as a result of such review, VA will apply 38 CFR § 3.114, if applicable. 38 C.F.R. § 4.124a, Diagnostic Code 8045 (effective October 23, 2008).

The definition of the term 'cognitive impairment' found in 38 C.F.R. § 4.124a, Diagnostic Code 8045, provides the rating criteria for traumatic brain injury. That definition is therefore relevant to how the Veteran's cognitive impairment is evaluated, and is as follows:

Cognitive impairment is defined as decreased memory, concentration, attention, and executive functions of the brain. Executive functions are goal setting, speed of information processing, planning, organizing, prioritizing, self-monitoring, problem solving, judgment, decision making, spontaneity, and flexibility in changing actions when they are not productive. Not all of these brain functions may be affected in a given individual with cognitive impairment, and some functions may be affected more severely than others. In a given individual, symptoms may fluctuate in severity from day to day. Evaluate cognitive impairment under the table titled 'Evaluation of Cognitive Impairment and Other Residuals of TBI not Otherwise Classified.'

That table, which accounts for symptoms not only of cognitive impairment but also of other residuals, includes the following 'facets': Memory, attention, concentration, executive functions; Judgment, Social Interaction, Orientation, Motor Activity, Visual Spatial Orientation, Subjective Symptoms, Neurobehavioral effects; Communication, and Consciousness.

The RO has evaluated the Veteran's cognitive impairment and his PTSD by application of the General Rating Formula for Mental Disorders found at 38 C.F.R. § 4.130. Indeed, the General Formula for Rating Mental Disorders applies to evaluating disability due to some thirty-five different diagnosable disorders including mood disorder, anxiety disorder, panic disorder, and dementia due to head trauma. The only mental disorders that are not evaluated under the General Formula for Rating Mental Disorders are the eating disorders anorexia nervosa and bulimia nervosa. See 38 C.F.R. § 4.130.

The General Formula provides examples of the kinds of symptoms that give rise to ratings ranging from noncompensable to total. Those symptoms include memory impairment, anxiety, panic attacks, difficulty in understanding complex tasks, space, time, and place disorientation, and intermittent inability to perform activities of daily living. Because the General Formula lists symptoms in a non-exhaustive manner it encompasses symptoms that are like in kind to those listed. The comprehensive and non-exhaustive criteria of the General Formula takes into account all of the Veteran's symptoms of anxiety and cognitive impairment.

The RO's grant of service connection for psychiatric symptoms was essentially a grant of service connection for cognitive impairment. Regardless of how the RO has labeled the disability, all of the symptoms of the Veteran's psychiatric disorder are described in the General Formula for Rating Mental Disorders.

To assign a rating for PTSD and then assign a separate rating for cognitive impairment would amount to impermissibly pyramiding the ratings. That term, 'pyramiding,' means evaluating the same disability under various diagnoses or evaluating the same manifestations under different diagnoses. 38 C.F.R. § 4.14. Even if there was a separate diagnosis of a cognitive disorder, both a cognitive disorder and an anxiety disorder are psychiatric disorders the symptoms of which are all encompassed by the symptoms listed in the General Rating Formula for Mental Disorders or symptoms of like kind.

The Board recognizes that a statement found in Amberman v. Shinseki, 570 F.3d 1377, 1381 (Fed. Cir. 2009) should be addressed. In that case, the Federal Circuit case agreed with the Veterans Court's holding in Esteban v. Brown, 6 Vet. App. 259 (1994) as to when 38 C.F.R. § 4.14 is and is not for application. Id. at 1381. In Esteban, a facial injury had resulted in that individual suffering disfigurement, painful scars, and muscle damage that made it difficult to chew. Esteban, 6 Vet. App. 261. As summarized in Amberman, '[b]ecause each diagnostic code dealt with different symptoms (cosmetic issues, pain, and difficulty chewing, respectively), the Veterans Court held that they did not constitute the 'same disability' or 'same manifestation,' and therefore section 4.14 was inapplicable.' Amberman, 570 F.3d at 1381 (citing Esteban, 6 Vet. App. at 261-62). The Federal Circuit agreed with the Veteran's Court's holding in Esteban that the critical element in assigning separate ratings is that none of the symptomatology of any of the conditions is duplicative or overlapping with the symptomatology of another condition. Id.

The statement of interest in Amberman, is 'bipolar affective disorder and PTSD could have different symptoms and it could therefore be improper in some circumstances for VA to treat the separately diagnosed conditions as producing only the same disability.' Id. at 1381. In the instant case, the Board finds that, even if the Veteran's cognitive impairment, was a separate condition, assigning separate ratings would be pyramiding. Examination of the evidence of record, as listed in Section III.B., below, shows that the cognitive impairment symptoms overlap and are duplicative of the anxiety disorder symptoms.

For example, during a VA examination for evaluation of PTSD was conducted in April 2010. The examiner found there were behavioral, cognitive, social, affective, or somatic symptoms attributed to PTSD and to include hypervigilance, isolation, irritability, and recurrent recollections. Additionally, on mental status examination, the VA PTSD examiner considered the other 'facets' of cognitive impairment to include memory (noted as mildly impaired), concentration (noted as impaired attention and/or focus), judgment (noted as not impaired), social interaction (noted as preferred not to go out socially), orientation (noted as orientation within normal limits), motor activity, neurobehavioral effects (which are noted to include aggression), communication (noted as within normal limits), and consciousness when rendering a PTSD diagnosis and Global Assessment Functioning (GAF) score. This evidence shows that his cognitive impairment symptoms overlap and are duplicative of his anxiety disorder symptoms.

Moreover, the Veteran's 50 percent disability rating prior to March 9, 2011 and his 70 percent rating since that date were based on symptoms that are common to both cognitive impairment and the anxiety disorder. That is, he has been compensated for disability due to anxiety disorder and cognitive impairment since the effective date of service connection. In the August 2011 Board decision, his impaired recent memory was considered in the rating of the disability. His concentration and memory problems were part of the basis for the 50 and 70 percent rating as explained by the Board in the August 2011 rating decision.

The Board finds that 38 C.F.R. § 4.14 prevents separately rating the cognitive disorder and the anxiety disorder but the rating criteria specific to traumatic brain injury would prevent separate ratings. Note (1) under 38 C.F.R. § 4.124a, Diagnostic Code 8045 provides as follows:

There may be an overlap of manifestations of conditions evaluated under the table titled 'Evaluation Of Cognitive Impairment And Other Residuals Of TBI Not Otherwise Classified' with manifestations of a comorbid mental or neurologic or other physical disorder that can be separately evaluated under another diagnostic code. In such cases, do not assign more than one evaluation based on the same manifestations. If the manifestations of two or more conditions cannot be clearly separated, assign a single evaluation under whichever set of diagnostic criteria allows the better assessment of overall impaired functioning due to both conditions. However, if the manifestations are clearly separable, assign a separate evaluation for each condition.

Delirium, dementia, and amnestic and other cognitive disorders shall be evaluated under the general rating formula for mental disorders; neurologic deficits or other impairments stemming from the same etiology (e.g., a head injury) shall be evaluated separately and combined with the evaluation for delirium, dementia, or amnestic or other cognitive disorder (see § 4.25). 38 C.F.R. § 4.126 (d). When a single disability has been diagnosed both as a physical condition and as a mental disorder, the rating agency shall evaluate it using a diagnostic code which represents the dominant (more disabling) aspect of the condition (see § 4.14). Id.

Because, the General Formula for Rating Mental Disorders specifically addresses all symptoms of the Veteran's anxiety disorder and cognitive impairment, those criteria are the proper criteria for evaluating disability due to the Veteran's service-connected psychiatric disorder, regardless of the RO's decision to explicitly grant service connection for cognitive impairment.

Because symptoms of his cognitive impairment and anxiety disorder overlap and are duplicative of each other and the regulations just discussed prohibit evaluating the conditions separately, it would be improper to assign separate ratings for each condition. The Board finds a separate rating for the Veteran's cognitive deficits as a residual of PTSD is not warranted. However, the Veteran's physical manifestations continue to be separately rated. 

Residuals of TBI, to include vertigo with abnormal gait.

The Veteran's service-connected physical residuals of TBI to include vertigo are evaluated pursuant to Diagnostic Code 6204. Under Diagnostic Code, a peripheral vestibular disorder is rated 30 percent for dizziness and occasional staggering. 38 C.F.R. § 4.87, Diagnostic Code 6204 (2013). The 30 percent rating is the maximum schedular rating under Diagnostic Code 6204. As the Veteran is already in receipt of the maximum disability evaluation under the diagnostic code, the Board will determine if a higher evaluation is warranted other applicable codes. 

Under 38 C.F.R. § 4.87, Diagnostic Code 6205, Meniere's syndrome (endolymphatic hydrops) manifested by hearing impairment with attacks of vertigo and cerebellar gait occurring from one to four times a month, with or without tinnitus, warrants a 60 percent evaluation. 38 C.F.R. § 4.87, Diagnostic Code 6205 (2013). 

These criteria are conjunctive, not disjunctive; thus all criteria must be met. See Melson v. Derwinski, 1 Vet. App. 334 (1991) (noting the use of the conjunctive "and" in a statutory provision meant that all of the conditions listed in the provision must be met). 

A note following the Diagnostic Code provides that hearing impairment should be rated separately rated. The Veteran has already been assigned a 10 percent rating for bilateral tinnitus. 

It is not contested that the Veteran has hearing impairment in the form of tinnitus, for which he is separately service-connected. Although hearing loss was initially noted at the time of the injury, the evidence reflects that hearing returned and there is no indication that he currently has hearing impairment. Additionally, while vertigo and an abnormal gait have been noted, there is no indication that he has cerebellar gait occurring one to four times per month so as to warrant an analogous rating to Meniere's disease. See 38 C.F.R. § 4.87, Diagnostic Code 6205 (2013). Cerebellar gait is defined as a staggering, unsteady and uncoordinated walk, with a wide base and the feet thrown out, sometimes with a tendency to fall to one side. Dorland's Illustrated Medical Dictionary 747 (30th Ed. 2003). It is more than mere unsteadiness, or even staggering. It is a very specific, and more severe, level of gait impairment. The rating schedule makes this clear; in the criteria for Diagnostic Code 6204, "occasional staggering" is one symptom of a peripheral vestibular disorder rated 30 percent disabling. Had the authors of the schedule meant the same level of impairment for both conditions, the same plain language would have been used and the same disability rating would have been assigned. Instead, the authors used "occasional staggering" to describe symptoms warranting a 30 percent disability under Diagnostic Code 6204 and "cerebellar gait" to describe one of the more severe symptoms that form the disability constellation warranting a total schedular rating under Diagnostic Code 6205. While the Veteran reports unsteadiness or lack of balance during or after attacks of vertigo, there is no showing of cerebellar gait. The Board cannot find that the level of functional impairment required for a 60 percent disability evaluation is warranted. See 38 C.F.R. § 4.87, Diagnostic Code 6205 (2013). 

In reaching the above conclusion, the Board has not overlooked the Veteran's statements with regard to the severity of his disability. The Veteran is competent to report on factual matters of which he had firsthand knowledge, e.g., experiencing unsteadiness and lack of balance; and the Board finds that the Veteran's reports have been credible. See Washington v. Nicholson, 19 Vet. App. 362, 368 (2005). Any lay evidence in this case was provided during the Veteran's VA and private examinations. He is competent to provide statements regarding his current symptomatology, and the Board finds that the Veteran's statements are credible. The Board has considered the Veteran's reports along with findings from the Veteran's examinations. The Board notes, with respect to the Rating Schedule, where the criteria set forth therein require medical expertise which the Veteran has not been shown to have, the objective medical findings and opinions provided by the Veteran's treatment reports and his examination reports have been accorded greater probative weight. See Espiritu v. Derwinski, 2 Vet. App. 492 (1992); Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993).

The Board has also considered whether the Veteran's disability presents an exceptional or unusual disability picture as to render impractical the application of the regular schedular standards such that referral to the appropriate officials for consideration of extra-schedular ratings is warranted. See 38 C.F.R. § 3.321(b) (1) (2013); Bagwell v. Brown, 9 Vet. App. 337, 338-39 (1996). The threshold factor for extraschedular consideration is a finding that the evidence before VA presents such an exceptional disability picture that the available schedular evaluations for that service-connected disability are inadequate. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993) ("[R]ating schedule will apply unless there are 'exceptional or unusual' factors which render application of the schedule impractical."). Here, the rating criteria reasonably describe the Veteran's disability level and symptomatology and provide for additional or more severe symptoms (under another diagnostic code) than currently shown by the evidence. Moreover, he is already in receipt of a separate rating for tinnitus. Thus, his disability picture is contemplated by the rating schedule, and the assigned schedular evaluation is, therefore, adequate. See Thun v. Peake, 22 Vet. App. 111, 115 (2008). Consequently, referral for extraschedular consideration is not warranted. 

The Board concludes that the medical findings on examination are of greater probative value than the Veteran's allegations regarding the severity of his disability. Accordingly, the Board concludes that the preponderance of the evidence is against the claim for an initial evaluation in excess of 30 percent for residuals of TBI to include vertigo, oscillopsias, abnormal gait, and status post repair of perilymph fistulas at any time during the appeal period. See Fenderson v. West, 12 Vet. App. 119 (1999); 38 C.F.R. § 5107(b) (West 2002).


 (ORDER ON NEXT PAGE)


ORDER

Entitlement to an initial evaluation in excess of 30 percent for residuals of TBI to include vertigo, oscillopsias, abnormal gait, and status post repair of perilymph fistulas is denied.



______________________________________________
LANA K. JENG
Acting Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs